There was a misdirected attack by the government against a basic and very common estate planning technique known as a private annuity sale. John Thomas and Lee Kidd, through affiliated entities, sold overriding royalty interests to Citadel Insurance Company in exchange for an annuity, a lifetime income stream. Those overriding royalties were an investment that formed part of the investable cash value of life insurance policies that Citadel Insurance Company had sold and had been indirectly purchased by irrevocable trusts benefiting the descendants of John Thomas and Lee Kidd. The income tax consequences of this transaction are pretty ordinary. It was a fully taxable sale. John Thomas and Lee Kidd recognized gain associated with the exchange and they have reported and paid taxes on that gain as they've received the annuity payments over the years. From a transfer tax perspective, however, it was quite a remarkable transaction. John Thomas and Lee Kidd were able to successfully transfer an appreciating asset that would And as payments were made on those overriding royalty interests over the years, they were able to transfer a significant amount of wealth, transfer tax free, to the next generation. Now this is an important point because we believe this is the real source of the government's discontent and frustration in this case. However, the government misfired and rather than bring a transfer tax case, they actually attacked the private annuity sale on income tax grounds. This misfire explains why the government's legal positions, which the district court adopted in a very wholesale fashion, simply don't fit the income tax issues presented. This misfire also explains why, on this appeal, the government has virtually abandoned the district court's assignment of income determination. We are here today to ask this court to basically take that square peg out of the round hole and to reverse the district court's determinations on both economic substance and assignment of income grounds. I have some questions. Yes. How did Citadel benefit from this transaction? Citadel sold the life insurance policies to entities that were indirectly owned by the Revocable Trusts. And as the insurance company, they were tasked with maintaining the cash value and the investments inside the life policy that would form part of their business. Who actually wrote the checkout for the annuity? The private annuity payments, Your Honor? Yes. Okay. The private annuity payments came from segregated accounts that housed the cash value of the life policies. Is it essentially Thomas and Kidd writing a check to themselves every year? I disagree with that, Your Honor. The segregated accounts, the evidence presented at trial showed that they were owned by Citadel Insurance Company, that they were maintained by Citadel Insurance Company. And there's quite a bit of testimony at trial talking about how Citadel maintained control. Okay. Well, then, can you answer my other question? Who is actually writing out the check for the annuity? You said Praik. It's kind of a vague answer. Can you pinpoint it for me? Yes, Your Honor. So the annuities, excuse me, the overriding royalties are deposited or paid to Citadel Insurance Company. They're deposited in the segregated accounts. The segregated accounts, there's a check that is issued from those segregated accounts, which again, make up the investable value of the cash value life insurance policies. Okay. Who signs the checks or writes the checks from the segregated account? I believe it is Citadel Insurance Company, Your Honor. The insurance company does it? Yes. But they did that at the request of Thomas and Kidd, and as I understand it, the district court found that Thomas and Kidd, in effect, controlled that account. The insurance company had agreed to do whatever Thomas and Kidd told them to do. They did find that, Your Honor. However, we disagree that that is supported by the evidence. We believe that the denial of the letter of wishes is significant in this matter. There was testimony by the head of the insurance company that said that there had been over 24 instances that he had recalled where letter of wishes were denied. Now, the government took issue with the number of times that it was denied, but nonetheless, it was still a denial, which showed that Citadel Insurance Company still had control over the segregated account LLCs. They may have had some evidence that they had control, but the government had a lot of evidence that Thomas and Kidd was the one that had the control, and the district court gets to make that call. I understand, Your Honor. I would also point out, however, that the level of control that was exerted is pretty typical. The government's insurance expert at trial actually testified that the ability to direct the investments inside a universal life policy, such as the universal life policies at issue in this case, is pretty plain vanilla. As a matter of fact, he called it industry standard. He even went so far to say that he didn't have any problems with the variable universal life policies in this case. I would further note that he testified that he personally owned a variable universal life policy, and that he was able to direct the investments inside that policy. Doesn't your entire argument hinge on overturning the district court's fact findings? I disagree, Your Honor, because we believe that the district court, notwithstanding some kind of conclusory statements that it lifted from the government's post-trial brief, if we were to hone in on the specific factual findings, we believe and contend that the specific factual findings show that there was real economic substance to this transaction. And so the substance is that it gives a guaranteed stream of income to the heirs or the people when they otherwise would have had the volatility of their investments in their business. Is that right? You're absolutely correct, Your Honor. The district court found that this was done for estate planning purposes. That's kind of a generalized term. There was testimony at trial that showed that there was estate, not only estate planning purposes, but retirement planning, that the advisors to John Thompson Lee Kidd had done a tremendous job of transferring a fair number of their businesses to the next generation through family partnerships, irrevocable trust, and basic estate planning. And now that John Thompson Lee Kidd were retiring and looking to exit the business, it was now time to create an income stream for them so that they would not have to depend upon their children as they entered their golden years. What about the fact, though, that the annuity payments were deferred until 2009? Doesn't the deferral of the payments suggest that the annuity transaction wasn't a legitimate arm's-length transaction? I respectfully disagree, Your Honor. That is a function of a change in the law, meaning there were regulations that the Treasury promulgated in October of 2006, which was after this private annuity transaction, which eliminated that deferral. But prior to that time, it was not uncommon, nor do we believe that it was unlawful to have that level of deferral to put those payments out for years. So they would have still been deferring if the Treasury wouldn't have kept them from being able to do that going forward. I mean, is there evidence in the record of anything about this, the deferring? I don't believe so. I think that it was set by the annuity agreements that it would be three years. They were not aware at the time that there would be a change in the regulations, but the pricing of the annuity reflected the fact that these payments were going to be delayed by three years. So there was an interest factor component and actually increased the amount of the annuity payment by virtue of the fact that the payments would not start for approximately three years. You know what got me is the income from the overriding royalty interest, there was never any tax paid on the income from those overriding royalty interest. And just because they were run through several entities and wound up in this cash account and became available for tax-free loans, made the entire transaction non-taxable, I don't see any economic substance to that. I'm sorry, I couldn't hear that last point, Your Honor. Well, what part did you not understand? There was a cough in the background. The tax benefits associated with this transaction, Your Honor, they are a function of the fact that we have life insurance involved. The tax laws are fairly well settled that the inside buildup inside a life insurance policy, the investments grow tax-deferred. They're not currently... That's the business protection insurance? No, Your Honor, that is the variable universal life policies at issue here. So the income tax benefits are really a function of the involvement of life insurance. And again, these are well settled laws that provide that the inside buildup of a variable universal life policy is tax-deferred and the overriding... Ordinarily, when you buy a policy, the premiums you pay, you've paid income tax on the money that you give the insurance company for premiums, don't you? Yes, Your Honor. They didn't do that here. I disagree. The premiums that were paid for the variable universal life policies were after-tax dollars. I don't believe that's a matter of dispute. What we're talking about here is the investments inside the cash value. So after the premiums have already been paid to the insurance company, they're housed in a segregated account, LLC, that basically protects the cash value of those life policies. And that is invested in a variety of different investments. And in this case, it was invested in the overriding royalties pursuant to this sale. What's your best case that this is illegitimate? Is it Southgate? What's your best case at this point? We believe that the trilogy of cases dealing with economic substance recently decided by this Court, starting with Klamath, Southgate, Nevada Partners, all established principles and based upon the Court's findings show economic substance here. I think one of the most significant points is that the District Court found that this transaction required the existence of third parties in order for the tax benefits to be achieved. And that since no third parties were present, that somehow the transaction didn't have substance. Well, that's a misstatement of the law. This Court held in its Kimball decision that a transaction that is bonafide between strangers is going to likewise be bonafide between related parties. So we think that's a significant point that was lost on the District Court. We also believe, as far as one of the cases that is, we think, very helpful and beneficial in showing why the District Court errs, is also Kimball with respect to the holding that it is an estate planning purpose can be a legitimate reason for undertaking a transaction. And interestingly, the District Court found in this case that there was an estate planning purpose to the transaction. So it's an estate planning purpose that has a substantial tax benefit, but you're allowed to have a mixed motive, so that's why it's legitimate. Is that your position? Yes, Your Honor. And as you point out, Southgate made clear that there can be a mixed motive. And the Court did find that there was an estate planning purpose here? Yes, Your Honor. But said that because it was self-dealing, that that was therefore not acceptable. Is that right? It's finding... It's not something, you know, between related parties. Yes. It's finding that there was an estate planning purpose is, when you read it in context, it's a bit strange and odd because the Court states that there's an estate planning purpose, but it almost states it in a way as if it is supporting the non-tax determination that the Court found or the, excuse me, the tax motivation determination that the Court found. There's kind of a misfit there because this Court has made clear that an estate planning purpose is a legitimate tax reason. You can't do anything just because it has no tax consequences just because you're doing estate planning. I mean, if you control the money, whether you give it to yourself or your children, if it's not a tax-exempt plan, it doesn't work. Well, let me address your point about control, Judge Davis, and that is we have to remember that this case involves a TEFRA partnership and that the real inquiry is, did Thomson Kidd Oil Production, the partnership, maintain any level of control? Yeah, but the District Court disregarded the partnership. I mean, they said Kidd and Thomson, in effect, were the partnership. And we believe that was improper, Your Honor. The government never alleged that the Thomson Kidd Oil Production partnership was a sham. They never alleged that it should be collapsed. The District Court acted unilaterally in doing so, and we believe that there was no basis. There was substantial evidence at trial that that was an ongoing concern. Business had been around for well over a decade in 2006 with very substantial operations in the oil and gas business. Do we have to find that's clearly erroneous for you to win? I don't believe so because, again, there were some conclusionary statements that the District Court lifted from the government's brief. But if we really look at the economic substance test, we see that it flows the economic, it looks to where the economic benefits go, and the economic benefits in this case very clearly end up in the life policies which Thomson Kidd Oil Production had no relation to. If TKOP wished to take back the overriding royalty interest, could it do so? I see that my time's up, and I answered your question. Thank you. No, it could not. Once they left, those overriding royalty interests became part, again, of the investable cash value of the life policies, and Thomson Kidd Oil Production had no further rights with respect to them. Okay. You have some time left in the book. Thank you. Mr. and Mrs. Adelson. Good morning. May it please the Court. The District Court here correctly found, after considering the very large factual record, that this royalty transaction was a tax shelter without any economic substance. Like the very similar business protection policy that the parties entered into first here, this was part of a tax shelter that used some of the very same segregated accounts set up through the alliance group to accomplish the circular movement of money through related entities in order to avoid tax. And the materials that promoted these transactions from the start show that, that that was the purpose. And this Court has held, in numerous cases, including the Merriman case and the Clath case, that in this circumstance, the appropriate approach where a transaction lacks economic substance is to disregard the transaction, which means the money stays with Thomson Kidd Oil Production. I'm sorry. I'm having a little trouble understanding. Can you go just a little bit slower? Certainly, Your Honor. I'm sorry. I think what's important here is this wasn't a legitimate transaction for buying an annuity. It was a transaction, as the District Court found, between entities that were under common control. When you buy an annuity as a real estate planning endeavor, the way to go about it is to pay tax on your income, and then you can buy an annuity. And here, not only was the annuity purchased with pre-tax income through this transaction with these offshore insurance companies that had the effect of transferring the money away and never being subject to U.S. tax, but it also created a situation where the people ultimately in control here, Thomson Kidd, could get the money back through policy loans and got a portion of it on a deferred basis as royalty payments without ever paying tax. They said that they did pay tax on them. Well, they paid tax on the royalty payments on a deferred basis to the extent that royalty payments were coming back in from the segregated account. So the private annuity would transfer these overriding royalty interests, which basically Hold on just a little bit. I'm having the same trouble.  You're right. I'll try to do my best, Your Honor. These overriding royalties created an income stream that's moved offshore into the segregated accounts, and then a small portion of that, a small percentage, comes back as the royalty payments, and they did pay tax with a three-year deferral on those royalty payments when they returned. But the bulk of the income stays offshore, and these accounts, the record very clearly shows, as the district court found, that the same people who would have gotten this income flowing through from the partnership, Thomas and Kidd, also controlled what was done with that money in the segregated accounts. They put their accountants and lawyers, Lustig and Henderson, in the role of investment managers of the segregated accounts, and they directed them regarding how the investments were made and when money was to be returned through policy loans. And then they controlled, as Joining said at 19, I think is the best example, that shows how they controlled not only when the money came back through policy loans, but also how that money was to be used, whether it went to their own investments or whether it was plowed back into Thomas and Kidd Oil Productions' business or one of their other businesses. But isn't it common industry practice to allow holders of cash value life insurance policy to obtain loans from those policies? The problem here, Your Honor, is twofold. First of all, normally when you buy one of these policies, you do it with after-tax dollars, and this endeavor to do this with money that had never been subject to tax, and it moved and the consideration was moving an income stream that was continuing perpetuity offshore and never making it subject to tax. The other problem with that— What's the problem with the loan, then? Well— I think there's loans and they can get loans. It's a problem that you believe the initial thing was not subject to tax. It's what the opposing counsel said at the beginning of his argument. The real problem is that the money was put in there pre-tax. It was put in there pre-tax, and secondly, I think this is really key to the economic substance point, is that they weren't getting a guarantee of a payment in exchange for this money. They weren't getting this sort of guaranteed, risk-free, continuous payment back because they were essentially making this contract with themselves because they control both ends of the transaction. So it was a circular flow of funds that let them not pay tax on the money, put it offshore for investment, bring it back when they wanted to, and never pay tax in this whole picture, and there was no third party with whom they were contracting. There was no arm's-length dealing. What third-party requirement is there? Well, I think, you know, for this sort of transaction, Your Honor, I think to be a bona fide business transaction, it has to be something that third parties would have entered into, and I think the record— Does it require a third party to be involved? Does Kimball and our case law require that? Well, I think Kimball's a very, very different scenario, Your Honor. Kimball's a situation where money was— it's an estate tax case in the first place, not an income tax case, and the issue is whether when a taxpayer has actually put their money into some sort of agreement, some sort of structure like a family limited partnership in Kimball that creates a diminution in value because of the restrictions on it, then that transaction is— or that structure is subject to a lesser valuation for estate tax purposes, so it's a very different case in this case. So is the government's position that because no third party is involved, this is wrong? Well, I think even if there were a third party involved, I mean, I think there is no third party involved. Is that a requirement for a legitimate transaction in the government's view? And if so, what authority do you cite for that? Your Honor, I think there certainly can be economic substance situations where intermediaries are used, straw men are used that are third parties, and there is no economic substance to the transaction. That's kind of the opposite of the question. I'm not asking if you can have straw deals and still with third parties be not good. I'm asking if you require a third party to be legitimate. It's the opposite question. Are you saying that— Do you need a third party in order to make a transaction legitimate or can it be with related parties and still be legitimate? I think, Your Honor, there could be a situation where two related parties engage in a legitimate transaction. Certainly that situation could arise. So the government does not require a third party for a transaction to be legitimate? That is correct, Your Honor. That's my question. But I think what's important here is that— I mean, there certainly could be a situation, for example, like if a father leases property to his son and they're related parties and that fair rent is paid that reflects fair market value, that would be a legitimate transaction between related parties. But the key is, under Klamath, in looking at whether there's objective economic substance, and under Merriman, the Court looks to whether this is something that would ordinarily occur in a bona fide business setting, whether two non-related parties would have entered into this transaction. And in that regard, the Court has looked at whether the transaction was at arm's length, whether this is something that actually shifted the risk in exchange for the consideration paid. And when the district court looked at this transaction here, it found, the record very clearly showed, that there wasn't the shifting of risk to a third party that would have warranted— Well, you don't have to— Well, even if it was a related party, for an annuity agreement, that's the fundamental basis of the annuity agreement, is that you shift the risk. You take your volatile income and exchange it for a regular stream of income. And that did happen, that the company had a volatile income and they gave them an annuity which gave them a regular stream. And in fact, the district court found that that was state planning. It's very odd the way the district court found the state planning, but it's in a negative context. Well, I think it found that Thomas said this was for state planning. I'm not sure that it actually found— But isn't it state planning to get an annuity with a regular, quote, stream of income? Well, the problem is that if you buy the annuity effectively from yourself, you don't get rid of the volatility because you still have the— you know, if you control both entities and there's no— and in the annuity context in particular, I mean, you asked the question about whether a third party had to be involved for a transaction to be legitimate, and I don't think that's true. But in the annuity context, where you're trying to shift a loss normally to an insurance company, you know, the insurance company says, I'll agree to take this property in exchange for a set payment, and you're shifting your volatility to that insurance company. And in the context where you control all the entities involved in an annuity transaction in particular, I think you don't accomplish that shift of loss that is the fundamental purpose of an annuity. But they don't have that duty to do the annuities each time? Pardon me? They don't have the duty to give the annuity out every time? But they're paying that annuity out of their own money. And so their obligation to do that is something that isn't providing the protection against risk. And I think, you know, so that's the problem, is that you have the same person on both sides of the transaction, so the money... ...your substance over form argument? Your Honor, we did not file a notice of appeal with respect to the determination that Thomas and Kidd actually were the person to whom the... there was a deemed distribution to them, which is the argument that the taxpayer raises for the first time on appeal. In retrospect, perhaps that would have been a good idea. But I think that argument was waived because they didn't assert that argument below. They just argued that a legitimate annuity transaction happened here. And I think the economic substance arguments and the beneficial ownership arguments that the district court did rely on are correct and lead to the result that the money should be attributed to Thomas and Kidd Oil Production. And that's the correct result here. And I think our trial attorneys, in looking at it, thought very clearly that the district court had gotten it right. And that's why that has not been pursued. But I think... And I think they're trying to take advantage of the fact that Thomas and Kidd are no longer in the case to whipsaw the government here. And after such egregious tax-avoidance transactions, to be able to do that at the 11th hour is, I think, something the court shouldn't allow. And given the very strong case, I think, that the district court found on the economic substance issue shouldn't be the result here. Talk about the estate planning feature of the taxpayer's argument. Well, I think the problem... I mean, I think they did do some estate planning. They created family-limited partnerships and that sort of thing as part of their structure that they were creating. But they also... Why doesn't that protect their tax claim, their tax-exempt claim? Well, I think, as I was just explaining, the annuity only serves a retirement and planning purpose when you... It would have been more of a retirement planning because when Thomas and Kidd died, the annuity would end. But the annuity, which is at issue in the royalty transaction, is one that doesn't have... Isn't the sort of transaction that would have given them any additional security because they were paying it themselves through these segregated accounts that they effectively owned through this structure of entities. And the Supreme Court has said time and time... In numerous cases, in Sonnen, in the Halbering v. Clifford case, that where these related entities are involved, the court should apply particular scrutiny. And it... I don't understand that, why it's not actually a risk. They exchanged a fluctuating mineral interest royalty subject to the risk of operating the well, right? Mm-hmm. And so some days you could get a dry hole or no recovery, the well's messed up or something and you don't get any recovery. And for a stream of guaranteed annuity payments, so they would... Every time the payments would be made, no matter what, no matter whether the well's producing or not the royalty interest, it doesn't depend because they already have the guarantee. Well, but the guarantee comes from them. That's the problem, Your Honor. The guarantee comes from another entity that ultimately is owned and controlled by Thomas and Kidd and that holds their money. So it's not subject. The annuity still has to be paid whether or not the well ever produces again. But it has to be paid out of their money so it doesn't accomplish anything in terms of... But it's money that they already put in so they chose to purchase a vehicle just like someone else would purchase annuity with whatever money. It seems to me that your real beef is they purchased it with this pre-tax dollars, not that they purchased an annuity. Well, I think that's part of the tax avoidance theme and I would just emphasize that under Colmath the fact that it was designed for tax avoidance alone is enough to find that there was no economic substance here. How can we say that it was designed for tax avoidance alone when it's just plain on its face that an annuity is better for a retirement person than is a fluctuating mineral interest royalty? Well, just to make a hypothetical to simplify it for your honor, your honor had two bank accounts, bank account A and bank account B and you decided that, and you had some stock investments and you decided you were going to sell your stock accounts to bank account A in exchange for royalty that's going to be in exchange for an annuity, a regular payment that's going to be paid into bank account B. You're just moving your money from account to account and you still in the end have the same amount of money. No because my annuity is going to give me some guarantee that I might not get, my stocks could go broke any day and I could lose everything. Your honor, I think you're missing that there is no, I mean just to confuse matters they did actually purchase a commercial annuity which is a legitimate transaction on the periphery, but the transaction that's troubling here is the private annuity which is the contract between Thomas and Kidd Oil Productions owners selling J Tom 2 and Kiddle 2 and the segregated account which was ultimately owned by Thomas and Kidd and that is like you saying I'm going to take my volatile money and put it in bank account A and then bank account A is going to pay back to bank account B that royalty payment. That's part of the subterfuge they used to disguise this transaction, but the transaction that caused the tax benefit was an annuity they bought from themselves. Who's on the hook for the guaranteed annuity, Citadel or just the money in there? The segregated accounts are on the hook. If it gets depleted there's what happens to the guaranteed income stream. Well, the problem is that it disappears you know, it doesn't exist except for to the extent that they have sort of backed it up with a separate corporate commercial annuity, but that's a separate agreement and that's I think like the kind of transactions that in cases like Southgate and the James case where there's a legitimate transaction on the periphery, you can't use that to legitimize the tax avoidance scheme because if they'd just gone out with their after-tax dollars and bought an annuity from the third party in the first place, that wouldn't be problematic, but what happened is that they used these layers of entities to move the money around and bought an annuity from themselves. If they'd bought the annuity from themselves with their after-tax dollars would the government be here today? If they bought an annuity from themselves with after-tax dollars probably not, I think because it wouldn't have the tax avoidance aspect of it but it would certainly not have the, I mean it certainly would not have the business risk, I mean I think it wouldn't in that respect. I'm not sure that, I mean as a practical matter under the economic substance you know, under the economic substance analysis it would be a transaction without tax avoidance, but whether we would have gone after it because there wouldn't have been the avoidance of tax involved is another question. How was the segregated account invested? What types of things was it invested in? Well I think that was the unique thing about these Alliance products and that is the reason that there's a criminal indictment pending against Mr. Crisfield and that is that they were set up in a very unusual way that let the customer direct what the segregated accounts were invested in, and so they use them to invest in these circular transactions like this royalty transaction like the business protection policies that accomplish the tax avoidance goal and most insurance products you know, you can, if I go out and buy a universal life policy from a U.S. insurance company, I might be able to invest in, you know, stock market you know, Wall Street, things that are on the Dow Jones industrial average and things like that or money market funds but I can't invest in unusual aspect of these and the testimony was very thorough in terms of all the experts and the parties that these were, and Henderson in particular testified that these were unusual because of the amount of control that they gave to the owners to control the investments and so basically it kept the use of this money for the investor because they could control what went into the segregated accounts and that aspect of control is what means the money never really changed hands and so the beneficial interest in the property never really shifts and you don't have a real exchange and I think Henderson's involvement in this also really demonstrates that this was not the kind of arm's length transaction that normally would be part of a bona fide transaction between two independent parties because if you were selling a volatile thing like overriding royalty interest in exchange for an annuity normally the seller would want or the person providing the annuity would want an independent valuation but here Henderson was on both sides of the transaction as both Thomas and Kidd Oil Productions accountant and the long term advisor of Thomas and Kidd and he was the investment advisor for the segregated account and he did the only valuation and it was notably as the district court found significantly off from the valuations that the experts at trial came up with and that it was very indicative that nobody really cared what the overriding royalties were worth because this transaction was about a transaction with themselves that would shift the value would shift this income stream offshore and avoid tax and I think it's really important to note that both when the business protection policies were promoted which was the reason they initially got into these policies and then with the subsequent royalty transaction the transactions were promoted as tax avoidance transactions. Listig who was their attorney did promote the royalty transaction but he had been taking cuts from Alliance for years he earned income to the tune of about 2.5 million dollars from promoting Alliance products so the fact that he came up with this and said here's another tax savings example that doesn't really change matters versus if it were Griffithville or Donaldson coming in and pitching this and I think the promotion materials that government exhibit 77 make very clear that this was promoted as a huge tax savings that was going to generate 1.1 million in tax savings over the first two years and importantly it shifts the income off stream over the long term so that this goes on for future years as well I see my time has elapsed are there any questions from the court? Thank you very much Mr. Danino back to you sir Just a few points for rebuttal government council mentioned that it believed that the commercial annuity was legitimate and that had after tax dollars been used to purchase the commercial annuity that we probably wouldn't be here today so I think it's important to clarify on the record that we had 5 million dollars of after tax money used to buy commercial annuities in December of 2005 those commercial annuities the segregated accounts for those commercial annuities effectively became segregated accounts for variable universal life policies meaning the annuities commercial annuities were liquidated to purchase new variable universal life policies so the idea that somehow these variable life policies were purchased with pre-tax dollars is just wrong so we wanted to clarify that this is not a case where you had pre-tax dollars going offshore to purchase the variable life policies it was after tax dollars but a lot of untaxed money went into that cash account didn't it which was used to pay these two taxpayers well that's no different than any other investment for example your honor had that 5 million dollars been used to purchase stock I don't think we'd be here today talking about whether a dividend on that stock would have been currently taxable to the policyholders you pay taxes on the money you buy stock with don't you that's correct and we pay taxes your use to initially purchase the life policies that issue all the money that went into the cash account I think we're starting to mix apples and oranges because the government is trying to bring in the other transaction at issue in this case which we did not appeal in this case it's very clean as far as there's the purchase of variable universal life policies with after tax dollars the investment that was made with those after tax dollars inside the life policy was the purchase of the overriding royalties so again just like any other investment it's going to accrue inside the variable life policy on a deferred tax basis and another point that council made was somehow that these were unusual aspects to the level of influence with respect to the investments was somehow unusual with respect to these variable life policies that's contrary to the government's own expert at trial Dr. Babel that testified that these variable universal life policies were industry standard that the features he found were consistent with the features one would expect with variable universal life policies Who bore the risk if there wasn't sufficient investment income to pay the guaranteed annuity It would have been borne by the segregated account LLCs that actually contracted with the private annuity but keep in mind that those segregated account LLCs had five million dollars and that's part of what it used to purchase the overriding royalties so it wasn't dependent upon necessarily the royalty stream that would likely occur in the future The government again is trying to tie this transaction Citadel wasn't independently on the hook for it I don't believe so I don't believe so I keep hearing as well that there's this circular flow of funds and I think that there's kind of a misunderstanding there because there's no question that the overriding royalties started with Thompson Kid oil production The district court found that the royalties ultimately came to rest in the life policies Thompson Kid oil production is not a beneficiary of the life policies Thompson Kid oil production does not have an interest in direct directly or otherwise in the policy holder which is predominantly the irrevocable trusts and Thompson Kid oil production is not a beneficiary of those irrevocable trusts So to say that there's somehow a circular flow of funds I think is misrepresentative of the transaction Well so if they didn't pay the people bore the risk, these LLCs are Ellen E. Kid and Those are the two LLCs that bore the risk Bore the risk of the overriding royalties About paying on the segregated accounts, if the segregated accounts didn't have the money to pay the annuities If the segregated accounts did not have the money to pay the annuities the persons at risk would be John Thomas and Lee Kid or one of their affiliates, the ones that contracted with the private annuity Which is Kid LLC and Well I believe it should have been J Tom 2 and Kid L2 I see my time's up, may I finish answering your question Alright, thank you very much We have your case